UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CRIMCHECK HOLDINGS, LLC, a Wyoming Limited Liability Company, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| TNFC, INC., a Tennessee Corporation; and DOES 1 through 100, | ) ) ) |
| Defendants. | ) ) |

Case No. 3:21-cv-00789
Judge Aleta A. Trauger

# MEMORANDUM

TNFC, Inc. ("TNFC") has filed a Motion for Judgment on the Pleadings (Doc. No. 18), to which Crimcheck Holdings, LLC ("Crimcheck") has filed a Response (Doc. No. 22), and TNFC has filed a Reply (Doc. No. 24). For the reasons set out herein, the motion will be denied.

## I. BACKGROUND[1]

Crimcheck is in the business of performing criminal background checks for employers. In order to perform its work, Crimcheck must have access to court records from numerous jurisdictions. While some courts have made the necessary records accessible electronically, others have not. For those courts without electronic records that can be accessed by a third party remotely, agents of Crimcheck must physically go to individual courthouses and perform manual searches. According to Crimcheck, jurisdictions requiring manual searching "include all state courts in Massachusetts, Delaware, Kentucky, Louisiana, Mississippi, and New Hampshire, approximately

---

[1] Unless otherwise indicated, the facts herein are from the Complaint (Doc. No. 1) and are taken as true for the purposes of the Motion for Judgment on the Pleadings.

70 percent of courts in Tennessee, 60 percent of courts in Arkansas, 70 percent of courts in Georgia, and 23 County Superior courts in California." (Doc. No. 1 ¶ 5.)

On January 16, 2020, Crimcheck purchased an Actual Net Loss Insurance Policy from TNFC, an insurance carrier. (*Id.* ¶ 6; Doc. No. 1-1.) The policy, which includes a choice-of-law provision stating that it is to be governed by Tennessee law, entitles Crimcheck to reimbursement of the "Actual Net Loss" attributable to certain occurrences referred to as "scheduled events," because they appear on the policy's schedule of coverage. (Doc. No. 1-1 at 34.) "Actual Net Loss" is defined to include any "[c]asualty incurred by **Insured** as a result of a **Scheduled Event**,"[2] as modified or further explained by the terms of the applicable coverage category. (Doc. No. 1-1 at 5.[3]) Crimcheck purchased coverage for a fairly extensive list of scheduled events, each with a liability limit of $750,000 and, with one exception irrelevant to this case, a $0 deductible. (*Id.* at 3–4.)

Among the scheduled events for which Crimcheck purchased coverage was Scheduled Event No. 8, which is defined as follows:

> **"Business Interruption – Civil Authority / Emergency Response Risk"** event . . . means the interruption or cessation of business of **Insured** at or from one or more of **Insured's** business locations for a period of no less than 24 hours, caused by a material restriction or prevention of access to or from, or ingress/egress to or from, or use of **Insured's** premises by **Insured**, **Insured's** vendors or suppliers, or **Insured's** customers or clients, resulting from an order, directive, or action by a civilian or government agency or entity, other than a branch of the United States military (or foreign military) or National Guard if activated to federal service (or foreign equivalent). **Actual Net Loss** in connection with a Business Interruption-Civil Authority/Emergency Response Risk event shall include **Income Loss** and **Extra Expenses**.

(Doc. No. 1-1 at 12–13.)

---

[2] The bold text in the policy indicates that the term being used has an explicit definition in the policy itself.

[3] The court cites to the page numbering of the PDF exhibit of the policy.

Crimcheck also purchased coverage for Scheduled Event No. 12, which similarly deals with certain types of business interruptions:

> **"Contingent Business Interruption"** event . . . means the interruption or cessation of **Insured's** business for a period of no less than 24 hours as a result of the interruptions to the business of any supplier, customer or referral source of **Insured**, caused by physical damage or loss to the real property or location of such supplier or customer. **Actual Net Loss** in connection with a Contingent Business Interruption event shall include **Income Loss** and **Extra Expenses**, including costs of cover, costs of advertising and marketing for new suppliers or customers, travel, lodging, meal and entertainment expenses incurred in selection of a new supplier or customer, and miscellaneous extra costs incurred in finding, meeting and negotiating with a new supplier or customer including costs to verify the background and references of prospective new suppliers or customers, and overtime pay and legal expenses incurred to draw up supplier or customer contracts.

(*Id.* at 14.)

Finally, Crimcheck purchased coverage for one more scheduled event that is potentially relevant to this case, Scheduled Event No. 66, which the policy defines as follows:

> **"Suppliers/Supply Chain Interruption"** event . . . means the interruption or cessation of Insured's business for a period of no less than 24 hours, as a result of the interruptions to the business of any supplier or customer of **Insured**, caused by interruptions not arising from damage to such supplier or customer's property, including strikes, riots, issues with ingress/egress to **Insured's** premises where there is no alternative route, pandemics, technology outages, or software failures; provided that such interruption or cessation of Insured's business would not be covered under **Scheduled Events**: **Business Interruption – Civil Authority/Emergency Response Risk** or **Business Interruption – Military Authority**, whether Insured opted for coverage for such Scheduled Events or not. **Actual Net Loss** in connection with a Suppliers/Supply Chain Interruption event shall include **Income Loss** and **Extra Expenses**, including costs of cover, costs of advertising and marketing for new suppliers or customers, travel, lodging, meal and entertainment expenses incurred in selection of a new supplier or customer, and miscellaneous extra costs incurred in finding, meeting and negotiating with a new supplier or customer including costs to verify the background and references of prospective new suppliers or customers, and overtime pay and legal expenses incurred to draw up supplier or customer contracts.

(*Id.* at 32.)

Crimcheck's business, along with so many others, did, in fact, end up being disrupted shortly after the policy was purchased, due to the impact of the COVID-19 pandemic. In Crimcheck's Complaint, it focuses on one particular source of that disruption: the physical closure of courthouses that Crimcheck needed to access to complete its background checks. According to Crimcheck, "[i]n Mid-March 2020, the States of Massachusetts, Arkansas, Georgia, Delaware, Kentucky, Louisiana, Mississippi, Tennessee, and New Hampshire closed their state courthouses to the public," followed in April by California. (*Id.* ¶ 9.) Those closures "remained in place throughout the first and second quarters of 2020." (*Id.*) The closures prevented Crimcheck from performing background checks involving those jurisdictions. (*Id.* ¶ 10.)

On April 3, 2020, Crimcheck submitted a claim to TNFC based on the interruption of its business. (*Id.*) While the claim was under review, Crimcheck "routinely provided updated information to TNFC regarding its business income losses and expenses associated with the COVID-19 court closures." (*Id.* ¶ 12.) TNFC requested various pieces of information from Crimcheck, including details regarding its mitigation efforts, which Crimcheck provided. (*Id.*) Crimcheck also remained in communication with TNFC's claim management company, Oxford Management Risk Management Group ("Oxford"). Among the issues that were discussed was the question of what would happen if Crimcheck—which, like many companies, was facing significant financial challenges—elected to stop paying its premiums for ongoing coverage. According to the Complaint, "Oxford repeatedly assured Crimcheck that any claims submitted prior to any initial nonpayment of premiums by Crimcheck would still be entitled to coverage under the Policy." (*Id.* ¶ 13.)

On February 4, 2021, Oxford informed Crimcheck that TNFC was denying Crimcheck's pending claim. According to the Complaint, "[w]hen Crimcheck consulted Oxford on the grounds

4

Case 3:21-cv-00789   Document 25   Filed 07/28/22   Page 4 of 17 PageID #: 159

for denial of the claim, Crimcheck learned that TNFC had relied on data provided up to July 2020 only[,] while disregarding all additional documents provided by Crimcheck"—seemingly because Crimcheck had stopped paying its premiums, although the Complaint is not entirely clear on this point. (*Id.* ¶ 14.) Oxford also informed Crimcheck that, due to its nonpayment, it could not pursue an appeal. (*Id.* ¶ 15.)

On October 15, 2021, Crimcheck filed a Complaint in this court against TNFC (as well as 100 undescribed "Does"). (Doc. No. 1.) Crimcheck states four causes of action. The First Cause of Action is for declaratory relief regarding Crimcheck's rights under the policy. (*Id.* ¶¶ 16–17.) The Second Cause of Action is for breach of contract arising out of the denial of Crimcheck's insurance claim. (*Id.* ¶¶ 18–24.) The Third Cause of Action is for violation of the implied covenant of good faith and fair dealing and violation of Tennessee's statute imposing penalties on an insurance carrier's bad faith refusal to pay, Tenn. Code. Ann. § 56-7-105. (*Id.* ¶¶ 25–31.) And the Fourth Cause of Action is for fraud, based on TNFC's actions leading up to and surrounding Crimcheck's decision to cease premium payments on the belief that doing so would not imperil its claim. (*Id.* ¶¶ 32–36.)

On December 28, 2021, TNFC filed its Answer and a Motion for Judgment on the Pleadings. (Doc. Nos. 15, 18.) In its briefing in support of the motion, TNFC does not focus on the issues surrounding Crimcheck's eventual nonpayment of premiums. (*See* Doc. No. 19 at 5 n.4 (conceding that, "for purposes of this Motion, Crimcheck's failure to pay the premium is not raised as a ground for judgment"). Rather, TNFC argues that, even taking all of Crimcheck's representations as true, TNFC correctly denied Crimcheck's claim because none of Crimcheck's losses fell within the policy's scope of coverage. If there was never any valid, compensable claim in the first place, Crimcheck argues, any additional questions of fraud or mishandling of the claim

are beside the point, because any such wrongdoing, even if it occurred, would not have resulted in damages.

## II. LEGAL STANDARD

A motion for judgment on the pleadings under Rule 12(c) is governed by the same standards that govern a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Reilly v. Vadlamudi*, 680 F.3d 617, 622-23 (6th Cir. 2012). In deciding a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002).

The Federal Rules of Civil Procedure require that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)). The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" as required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[threadbare] recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III. ANALYSIS

"The purpose of business interruption insurance is to protect the insured against losses that occur when its operations are unexpectedly interrupted, and to place it in the position it would have occupied if the interruption had not occurred." *Cont'l Ins. Co. v. DNE Corp.*, 834 S.W.2d 930, 934

(Tenn. 1992) (citation omitted). That purpose, however, is subject to the limitations imposed by the relevant policy itself, which must be construed as "a question of law involving the interpretation of contractual language." *Clark v. Sputniks, LLC*, 368 S.W.3d 431, 441 (Tenn. 2012) (citing *U.S. Bank, N.A. v. Tenn. Farmers Mut. Ins. Co.*, 277 S.W.3d 381, 386 (Tenn. 2009)); *see also Charles Hampton's A-1 Signs, Inc. v. Am. States Ins. Co.*, 225 S.W.3d 482, 487 (Tenn. Ct. App. 2006) ("In general, the interpretation of an insurance policy is a question of law and not fact.") (citation omitted). The policy that Crimcheck purchased did not provide general coverage for all business interruptions; rather, it included, as part of its menu of available coverages, coverage for various types of discretely defined types of business interruption. The court, accordingly, must consider the individual types of coverage encompassed by the relevant scheduled events and determine whether the business interruption that Crimcheck suffered was, in fact, of a type covered by the policy.

## A. Scheduled Event No. 8

Scheduled Event No. 8 encompasses "the interruption or cessation of business of Insured at or from one or more of Insured's business locations for a period of no less than 24 hours," if that interruption or cessation was "caused by a material restriction or prevention of access to or from, or ingress/egress to or from, or use of Insured's premises by Insured, Insured's vendors or suppliers, or Insured's customers or clients, resulting from an order, directive, or action by a civilian or government agency or entity." (Doc. No. 1-1 at 12–13.) It is undisputed that the Complaint alleges that civil authorities ordered the temporary closure of certain facilities relevant to Crimcheck's business model—namely, the various state courthouses that it was required to physically visit in order to perform complete and comprehensive criminal background checks. TNFC, however, argues that those closures did not fall within the scope of Scheduled Event No.

8, because Scheduled Event No. 8 requires the restriction or prevention of access to the "Insured's premises," and there was no government-ordered closure of Crimcheck's own facilities.

Crimcheck makes two alternative arguments for why Scheduled Event No. 8 nevertheless applies to these facts. First, Crimcheck argues that, while it may have been the courthouse premises that were shut down, the actual business interruption took place at Crimcheck's offices, which, Crimcheck argues, should be sufficient under the policy. Second, Crimcheck argues that, if the court is unconvinced by Crimcheck's first argument, the court should construe the policy to treat the shuttered courthouses as "business locations" of Crimcheck, given their centrality to Crimcheck's operations.

Neither of Crimcheck's arguments represents a plausible interpretation of the underlying language. With regard to the first argument, Crimcheck is simply erasing one of the provision's key requirements. Scheduled Event No. 8, by its plain text, requires *both* (1) the cessation of business "at or from one or more of Insured's business locations" *and* (2) that the cessation be "caused by a material restriction or prevention of access to or from, or ingress/egress to or from, or use of Insured's premises." Crimcheck's argument that it experienced its losses at its own business location addresses, at most, the first of those requirements, but it wholly ignores the second. Neither the plain language of the policy nor the ordinary law of contractual interpretation permits such a reading. *See Hyatt v. Adenus Grp., LLC*, No. M2021-00645-COA-R3-CV, 2022 WL 2677185, at *18 (Tenn. Ct. App. July 12, 2022) ("Tennessee law generally provides that contracts should not be interpreted in ways that render portions meaningless.") (citing *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008)).

Crimcheck's second argument, in contrast, does account for the full language of the provision, but it does so by disregarding the plain, ordinary meaning of the terms involved. An

ordinary, reasonable reader would not think that the nation's public courthouses are "[Crimcheck]'s premises" simply because Crimcheck performs some of its work there. *See Perkins v. Metro. Gov't of Nashville*, 380 S.W.3d 73, 85 (Tenn. 2012) ("[C]ourts must . . . ascertain the parties' intent from the 'usual, natural, and ordinary meaning of the contractual language.'") (quoting *Teter v. Republic Parking Sys., Inc.*, 181 S.W.3d 330, 342 (Tenn. 2005)). That is not how possessive nouns, when applied to physical facilities, work. "Crimcheck's premises" are, at most, the premises actually controlled, in at least some meaningful part, by Crimcheck—not public facilities that Crimcheck, like anyone else, is able to access because the facilities are open to all.

Nothing in the policy's definitions section salvages Crimcheck's arguments. "Premises" is not a defined term. The "Insured," according to the policy, is Crimcheck—not Crimcheck and the government entities on which it relies. (Doc No. 1-1 at 3, 8.) None of the other key words in the definition of Scheduled Event No. 8—such as "ingress/egress," "restriction," "prevention," or "access"—has a specialized definition that would support a departure from the language's plain meaning. (*See id.* at 5–10.) Scheduled Event No. 8 therefore does not support a right of recovery by Crimcheck under the policy.

### B. Scheduled Events Nos. 12 & 66

Before the court can address the other potentially relevant scheduled events, it must consider a preliminary matter. TNFC argues that "Crimcheck's Complaint claims only that the 'Business Interruption – Civil Emergency Response' coverage is at issue" in this case and that Crimcheck therefore cannot rely on any of the other Scheduled Events to recover. (Doc. No. 19 at 9.) Crimcheck, however, argues that it should be able to rely on the other two aforementioned scheduled events, in addition to Scheduled Event No. 8, and states that it can amend the Complaint to clearly state claims under those theories of recovery, if necessary. (Doc. No. 22 at 10–11.)

9

Crimcheck could have amended its Complaint as a matter of course within twenty-one days of TNFC's filing of its Answer and Motion for Judgment on the Pleadings. *See* Fed. R. Civ. P 15(a)(1). Although Crimcheck technically did not do so, it did inform the court of its desire to amend, if necessary, during that period, when it filed its Response. (*See* Doc. No. 22 at 10–12.) The court, moreover, sees no reason why Crimcheck would be denied the opportunity to make a potentially meritorious amendment. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) ("Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded."). Accordingly, and in the interest of efficiency, the court will consider Crimcheck's potential theories of recovery under Scheduled Event No. 12 and Scheduled Event No. 66 now, and Crimcheck will be permitted to amend its Complaint if the court concludes that one or more of those theories is potentially viable.[4]

**Scheduled Event No. 12.** Scheduled Event No. 12 encompasses any "cessation of Insured's business for a period of no less than 24 hours as a result of the interruptions to the business of any supplier, customer or referral source of Insured, caused by physical damage or loss to the real property or location of such supplier or customer." (Doc. No. 1-1 at 14.) TNFC argues that that provision does not apply because, even assuming that court systems were "suppliers" for the purposes of Crimcheck's business, their closing was not the result of "physical damage or loss

---

[4] The court notes that it is debatable whether amendment is even necessary here. The Complaint states claims based on TNFC's failure to pay under the policy's business interruption coverage, and Scheduled Events Nos. 12 and 66 are part of that coverage. Moreover, while it is true that Scheduled Event No. 8 is the only one directly cited in the *written text* of the Complaint, the entire policy is attached as an exhibit, and "a 'copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." *Jones v. City of Cincinnati*, 521 F.3d 555, 561 (6th Cir. 2008) (quoting Fed. R. Civ. P. 10(c)). Finally, by the court's reading, the statements of the causes of action themselves mostly frame TNFC's alleged wrongdoing in terms of general failure to pay a valid claim, without narrowly tying that failure to Scheduled Event No. 8. (Doc. No. 1 ¶¶ 16–31.) One could argue, therefore, that claims based on Scheduled Events Nos. 12 and 66 were sufficiently pleaded in the first place. Nevertheless, allowing an amendment to resolve any ambiguity would undoubtedly place Crimcheck's claims on firmer ground.

to the real property or location of such supplier." With regard to "physical damage," that appears plainly correct; the courthouses in question were not shut down due to physical damage. The phrase "loss to the real property or location of [the] supplier" is, at least at first glance, more ambiguous.

A review of cases, however, confirms that the phrase "loss to property" is, in fact, one that has frequently been used in the insurance context. *See, e.g.*, *Phillips v. United Servs. Auto. Ass'n*, 146 S.W.3d 629, 632 (Tenn. Ct. App. 2004) (quoting policy). The phrase appears typically to refer to actual damage to, or taking of, physical property, not merely the imposition of a restriction on the property's use. *See, e.g.*, *Patterson v. Shelter Mut. Ins. Co.*, No. M2014-01675-COA-R9-CV, 2015 WL 5320231, at *2 (Tenn. Ct. App. Sept. 11, 2015) (damage to a structure by a sinkhole); *Tuturea v. Tenn. Farmers Mut. Ins. Co.*, No. W2009-01866-COA-R3-CV, 2010 WL 2593627, at *6 (Tenn. Ct. App. June 29, 2010) (destruction of real and personal property by fire); *Walker v. Beasley*, No. W2009-00118-COA-R3CV, 2009 WL 4801480, at *2 (Tenn. Ct. App. Dec. 15, 2009) (structure sinking due to presence of underground debris); *Phillips*, 146 S.W.2d at 632, 636 (water damage); *Black v. State Farm Mut. Auto. Ins. Co.*, 101 S.W.3d 427, 428 (Tenn. Ct. App. 2002) (damage to a vehicle); *Smith v. Allstate Ins. Co.*, No. 34, 1987 WL 30150, at *1 (Tenn. Ct. App. Dec. 30, 1987) (theft of personal property); *Gerkin v. N.Y. Cent. Mut. Fire Ins. Co.*, No. C/A 1072, 1986 WL 11232, at *1 (Tenn. Ct. App. Oct. 9, 1986) (theft of fixtures from real property). These prior instances, therefore, do not support Crimcheck's broad reading of Scheduled Event No. 12.

Of course, the COVID-19 pandemic was an unusual event, and courthouses are, at least compared to ordinary business premises, unusual places, so the lack of prior examples directly on point is not necessarily surprising. The restrictions at issue in most cases involving "loss to property," however, are not even of the same general type at issue here. Crimcheck, moreover, has not provided any basis for concluding that "loss to property," as used in this context, does have a

11

special, broader meaning than the ones apparent from past examples. The court therefore construes Scheduled Event No. 12 to require physical damage, destruction, or loss of the supplier's property. Based on that reading, Scheduled Event No. 12, like Scheduled Event No. 8, provides no basis for Crimcheck's claims.

**Scheduled Event No. 66.** Scheduled Event No. 66, in contrast with Scheduled Event No. 12, expressly covers losses due to "interruptions not arising from damage to [the relevant] supplier or customer's property." (Doc. No. 1-1 at 32.) Indeed, Scheduled Event No. 66 expressly includes covered losses due to "interruptions to the business of any supplier" by a "pandemic[]." (*Id.*) Moreover, while a state courthouse may not be what immediately comes to mind when one imagines a business's "supplier," it is difficult to see how the appellation would not apply to courts, in the context of Crimcheck's business model. Crimcheck sells information about criminal cases, which the courts at issue supply.[5] Scheduled Event No. 66 therefore appears to be the closest fit, by a considerable margin, to the losses that Crimcheck alleges.

TNFC argues that it was nevertheless entitled to deny Crimcheck's claim, even under Scheduled Event No. 66, because Crimcheck "failed to allege the necessary 24-hour interruption/cessation" of its own business, which TNFC identifies as a "factual predicate to this coverage." (Doc. No. 24 at 4.) TNFC is correct that, based on the plain language of Scheduled Event No. 66, such interruption or cessation of Crimcheck's business is required to recover; Scheduled Event No. 66 expressly requires the "interruption or cessation of Insured's business for a period of no less than 24 hours." (Doc. No. 1-1 at 32.) As TNFC points out, moreover, the

---

[5] TNFC initially argued that, insofar as Crimcheck wished to recover under Scheduled Event No. 66, it could not do so because it failed to identify the relevant courts as "key suppliers" in its underwriting materials. (Doc. No. 19 at 12 n.6.) Insofar as the court could even consider such an argument at this stage, however, it would be unavailing, because, as Crimcheck has pointed out, nothing in Scheduled Event No. 66 states that it applies only to suppliers identified as "key." To the contrary, it expressly applies to "any supplier."

12

Complaint lists a number of mitigation strategies that Crimcheck resorted to during the pandemic that inherently suggest that Crimcheck was, at least at points, continuing to function, albeit far less successfully so: "extending business hours, reducing payroll, review of operations, work from home measures, salary reductions, rent deferment, new product development, revised marketing strategies, etc." (Doc. No. 1 ¶ 12.) The fact that Crimcheck continued some level of functioning during portions of the pandemic, however, does not necessarily mean that it was continuously in operation. Any loss-creating cessation or interruption of Crimcheck's business caused by the courthouses' closure and lasting for at least 24 hours would have been sufficient to trigger the coverage, even if that brief closure had been surrounded on both sides by periods of reduced, but active, functioning. The court accordingly must review the Complaint to determine whether its allegations, read in the light most favorable to its claims, plausibly state a cessation of Crimcheck's own business for a period of at least 24 hours.

Aside from the Complaint's quoting of Scheduled Event No. 8, the text of the Complaint expressly acknowledges the 24-hour requirement twice. (Doc. No. 1 ¶¶ 17, 19.) The first mention, read literally and in isolation, does not expressly state that Crimcheck fully ceased operations for 24 hours, but rather that Crimcheck "suffered an interruption of business resulting from a restriction of access to vendors or supplies for a period in excess of 24 hours." (Doc. No. 1 ¶ 17.) Technically, a restriction of access to vendors that lasted longer than 24 hours could still give rise to an interruption of Crimcheck's business that *did not* last 24 hours. In the context of the Complaint as a whole, however, a reading that would support Crimcheck's claim appears more plausible. Specifically, the Complaint, by quoting the definition of Scheduled Event No. 8 earlier in its text, has already plainly acknowledged, before the sentence at issue, that a covered interruption of Crimcheck's business must be at least 24 hours. (*See* Doc. No. 1 ¶ 7.) The quoted

13

sentence also states that the interruption was the direct result of events that *did* last longer than 24 hours. While Crimcheck could have been clearer in its averments, the court finds this assertion to be likely sufficient to state a 24-hour-or-more interruption of Crimcheck's own business.

In any event, the second reference to the 24-hour requirement, though still not as clear as it could be, specifically states that, "when COVID-19-related court closures restricted Crimcheck's access to vendors or supplies for a period exceeding 24 hours" it resulted in "[a] 'Scheduled Event,' *as defined by the Policy*." (*Id.* ¶ 19 (emphasis added).) A business interruption as described could only be a scheduled event "as defined by the Policy" if it lasted longer than 24 hours. While the question remains close, the court ultimately finds Crimcheck's pleading of this fact to be adequate.

The court is not blind to the fact that the Complaint never outright says, clearly and explicitly, "Crimcheck ceased its own operations for longer than 24 hours." The court, however, is also mindful that it is not necessarily easy to judge whether a business has actually suffered a "cessation or interruption," particularly if the business does not perform most of its work through a brick-and-mortar, open-to-the-public storefront with an "Open" or "Closed" sign on the door. The uncertainty of what it means for a business to be truly interrupted is demonstrated by the fact that courts in cases involving alleging business interruptions have reached an array of conclusions based on the facts of specific cases and the details of the policy terms at issue. *See, e.g.*, *Legal Sea Foods, LLC v. Strathmore Ins. Co.*, 523 F. Supp. 3d 147, 154 (D. Mass. 2021) (holding that business interruption coverage did not apply to restaurant forced to cease some operations, but permitted to remain physically accessible and continue carryout and delivery sales); *Blue Springs Dental Care, LLC v. Owners Ins. Co.*, 488 F. Supp. 3d 867, 875 (W.D. Mo. 2020) (concluding that business interruption coverage potentially applied despite the fact that only three of policyholder's four clinics were fully closed); *Archer Daniels Midland Co. v. Aon Risk Servs., Inc. of Minnesota*,

356 F.3d 850, 855 (8th Cir. 2004) (rejecting argument that business interruption policy applied only to losses resulting from a full cessation of operations, in case where policyholder was forced to incur substantial expenses to continue operations due to a flood); *Broad St., LLC v. Gulf Ins. Co.*, 37 A.D.3d 126, 133, 832 N.Y.S.2d 1, 6 (2006) (holding that business interruption policy applied only for period of complete cessation of operations due to September 11, 2001 attack).

Depending on the nature of both the business and the disruption involved, whether a particular operation was actually interrupted, as opposed to simply impaired, may call for a more searching inquiry than a simple yes-or-no question about whether there was an expressly, contemporaneously acknowledged closure. At this stage, it suffices to conclude that the Complaint alleges, albeit not as clearly as it could have, that a qualifying interruption of Crimcheck's business occurred.

**C. Actual Net Loss**

Finally, TNFC argues that, even if the court adopts a reading of the policy that would theoretically permit recovery for Crimcheck's interruption of business due to pandemic-related courthouse closures, TNFC's denial of Crimcheck's claim was appropriate because Crimcheck did not suffer any actual net loss attributable to the closures in this case. Specifically, TNFC argues that "Crimcheck's losses were caused by the historic drop in hiring that occurred in March 2020, one that would have existed whether the courthouses were opened or not."[6] (Doc. No. 24 at 5.) TNFC argues, moreover, that the court can take judicial notice of those job losses without converting TNFC's motion to a Rule 56 motion for summary judgment. (*See id.*)

---

[6] Although neither party has pursued this line of reasoning, the court notes that, at least according to the policy's definition section, Scheduled Event No. 66 applies to any qualifying loss caused by "interruptions to the business of any supplier *or customer*." (Doc. No. 1-1 at 32.) It is therefore not immediately clear to the court why a collapse in demand from customers would necessarily pose an unrecoverable loss under the policy, at least if some of that collapse in demand were due to customers' pausing or ceasing their own operations, rather than simply hiring less.

15

The court has little doubt that it could, if necessary, take judicial notice of the fact that many people lost their jobs early in the COVID-19 pandemic and that businesses engaged in relatively limited new hiring during that period. As TNFC notes, "courts may take judicial notice of government statistics," *United States v. Neal*, 577 F. App'x 434, 452 n.11 (6th Cir. 2014), and government labor statistics appear to confirm such a trend. More broadly speaking, moreover, the court may take judicial notice of any "fact that is not subject to reasonable dispute because it . . . is generally known within the trial court's territorial jurisdiction," Fed. R. Evid. 201(b)(1), and that rule has been construed to permit a court to acknowledge, among other things, obvious demographic facts about a jurisdiction's workforce, *see Caulfield v. Bd. of Educ. of City of N.Y.*, 486 F. Supp. 862, 885 (E.D.N.Y. 1979), aff'd, 632 F.2d 999 (2d Cir. 1980) ("[T]he Court takes judicial notice of the fact that historically in New York City, a large percentage of the teaching force, particularly at the lower school levels, has been composed of women."). The fact that the court can take some judicial notice of the extraordinary disruptions associated with the COVID-19 pandemic—including disruptions to employment and hiring—should therefore be uncontroversial.

General notice of a broad trend, however, only gets one so far—particularly when it comes to a question that calls for numerical precision, which an allegation of zero losses does. Did the collapse in hiring associated with COVID-19 hurt Crimcheck's business, even aside from the fact that Crimcheck's agents could not get into courthouses? Probably so. There is, however, no basis for making the leap from suspecting that many of Crimcheck's 2020 losses were unrelated to courthouse closures to concluding that those closures caused no losses whatsoever. Plenty of individuals continued to work throughout the pandemic, and many businesses continued to function. Some businesses undoubtedly filled positions. Indeed, some positions may even have

16

been *created* by the pandemic's reshuffling of existing economic patterns and/or the rise of directly pandemic-related labor needs, such as those in the healthcare field. The court cannot simply assume that Crimcheck would have been wholly without business during the pandemic regardless of its capacity to perform background checks, such that it was incapable of suffering losses directly attributable to courthouse closures. The court therefore cannot grant TNFC judgment on the pleadings on that basis. The court will instead deny the TNFC's motion and grant Crimcheck leave to file an Amended Complaint consistent with this Memorandum.[7]

### III. CONCLUSION

For the foregoing reasons, TNFC's Motion for Judgment on the Pleadings (Doc. No. 18) will be denied, and Crimcheck will be granted leave to file an Amended Complaint.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

[7] If Crimcheck wishes to continue stating claims against unidentified "Doe" defendants in the Amended Complaint, it should clearly identify the basis for any such claims, even if it does not know the legal names of the defendants themselves.